25 F.3d 1047
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Millard K. BROWN, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
 No. 93-5171.
 United States Court of Appeals, Sixth Circuit.
 May 24, 1994.
 
 Before: NELSON, SUHRHEINRICH, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from an order rejecting a collateral attack on a federal criminal conviction. After exhaustion of his direct appeal rights, the petitioner sought relief under 28 U.S.C. Sec. 2255 on the theory that the lawyers who had represented him at trial performed so badly that he was denied effective assistance of counsel in a constitutional sense. The district court concluded that the lawyers' performance satisfied the requirements of the Sixth Amendment. We have no basis for overturning that conclusion, and we shall affirm the denial of relief.
 
 I.
 
 2
 On August 18, 1988, Mike Dover, a helicopter pilot with the Tennessee Highway Patrol, conducted aerial surveillance of certain property located in Jackson County, Tennessee. Dover alerted Officer Thomas Gothard, of the Tennessee Alcohol Beverage Commission, to the existence of a patch of marijuana growth on the property of Lucille Brown, the mother of petitioner Millard K. Brown. Upon inquiry, Mrs. Brown told Officer Gothard that her son Millard, who lived in a separate house on the property, regularly tended her garden. She summoned her son by telephone, and he arrived at her home shortly thereafter.
 
 
 3
 Officer Gothard gave Mr. Brown Miranda warnings but told him that he was not under arrest. Mr. Brown, who denied any knowledge of the marijuana, mentioned a previous felony conviction for counterfeiting. At the conclusion of the conversation Mr. Brown drove back to his own residence.
 
 
 4
 Moments later, Pilot Dover directed Officer Gothard's attention to a marijuana patch located behind Millard Brown's residence. Dover then observed a car driving away from Mr. Brown's house. ABC agents pulled the vehicle over, discovered that Millard Brown was the operator, and asked him to return to his residence for questioning. Mr. Brown complied.
 
 
 5
 Mr. Brown consented to a search of his residence and opened his front door for the officers. In the course of the search the agents found a small amount of loose, dried marijuana in an upstairs crawl space. It appeared to the officers that the crawl space, which was a very hot area, had been used for drying marijuana plants. The agents also found a plastic bag containing marijuana in a vase on top of a gun cabinet. In the gun cabinet the officers found a loaded .22 caliber pistol, an unloaded .30 caliber pump action rifle with no serial number, and a .50 caliber powder rifle. Near the gun cabinet the agents found a loaded Mossberg, commonly called "the Persuader."
 
 
 6
 In a downstairs bedroom the agents uncovered four plastic one-gallon bags filled with marijuana weighing a total of 840.7 grams. A suitcase in the same bedroom contained a plastic bag on which there was marijuana residue. In another bedroom the agents found a loaded .22 caliber rifle with no serial number.[1] In the kitchen the agents found four plastic baggies containing marijuana, a plastic bottle containing marijuana seeds, two sets of scales commonly used for weighing marijuana, and other drug paraphernalia.
 
 
 7
 Meanwhile, two agents searched the car in which Mr. Brown had attempted to drive away from the residence. They found four five-gallon buckets containing marijuana weighing a total of 13.6 pounds. The glove compartment contained a loaded .25 caliber automatic pistol. The estimated value of all the marijuana recovered from the house and the car (excluding the marijuana that was still growing on the property) was close to $24,000.
 
 
 8
 Mr. Brown was convicted of manufacture and possession of marijuana with intent to distribute it, in violation of 21 U.S.C. Sec. 841(a)(1); being a convicted felon in possession of firearms, in violation of 18 U.S.C. Sec. 922(g); and use of firearms during and in relation to the commission of the marijuana offense, in violation of 18 U.S.C. Sec. 924(c). The case was tried to a jury, with the defendant being represented by attorneys Donald Dawson and James White, Jr. The jury found Mr. Brown guilty on all counts. The court sentenced him to concurrent terms of imprisonment totalling 21 months on the first two counts and an additional five years--the minimum permitted by 18 U.S.C. Sec. 924(c)--on the third count.
 
 
 9
 Mr. Brown perfected a direct appeal to this court, alleging error in the district court's refusal to suppress evidence seized during the search. Brown also contended that his conviction for use of a firearm in relation to a drug trafficking offense was not supported by substantial evidence. Finding no error, this court affirmed the conviction. See United States v. Brown, No. 89-6281 (6th Cir. Aug. 23, 1990) (unpublished).
 
 
 10
 In May of 1992, asserting that he had not received effective assistance of counsel because his lawyers (1) had not told him about the expiration date of a plea offer, (2) had failed to interview certain witnesses, and (3) had refused to let him testify at trial, Mr. Brown moved for relief under 28 U.S.C. Sec. 2255. After holding an evidentiary hearing, the district court concluded that the attorneys' performance satisfied the standards of the Sixth Amendment; the Sec. 2255 motion was denied, and this appeal followed.
 
 II.
 
 11
 The burden facing someone in Mr. Brown's situation was described thus in Strickland v. Washington, 466 U.S. 668 (1984):
 
 
 12
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.
 
 
 13
 The district court held that Mr. Brown had not made either of the requisite showings; his lawyers' overall representation "did not fall 'below an objective standard of reasonableness,' " quoting Strickland, id. at 688, and their tactical decisions represented "reasonable trial strategy."
 
 
 14
 Mr. Brown argues that it was objectively unreasonable for his lawyers not to inform him of the cutoff date of a plea offer he now wishes he had accepted. The district court found, however, that Mr. Brown was fully informed by his attorneys of the terms of the government's plea offer, including the acceptance deadline. This is a factual determination, and we will not disturb it on appeal unless we conclude that it was clearly erroneous. See Lewandowski v. Makel, 949 F.2d 884, 889 (6th Cir.1991).
 
 
 15
 As the district court noted, Mr. Brown's attorneys documented five separate conferences in which the government's plea offer had been discussed. The court further noted that one of the attorneys was experienced in federal criminal matters, including plea bargains. We cannot say that the court committed clear error in finding that Mr. Brown had in fact been made aware of the terms on which the plea bargain was offered.
 
 
 16
 Mr. Brown's second ground for asserting ineffectiveness of counsel involves his attorneys' failure to pursue leads on several witnesses and to call certain witnesses to testify on his behalf, as detailed below. His lawyers testified before the district court that the evidence these potential witnesses might have offered would either have been cumulative or more prejudicial than beneficial. In their judgment, the lawyers testified, it was better trial strategy to keep the witnesses off the stand. We find no clear error in the district court's factual determination that the lawyers' decisions were the product of due deliberation, and we agree that Mr. Brown has not overcome the "strong presumption" that the lawyers' tactical decisions were strategically sound. See Strickland, 466 U.S. at 689.
 
 
 17
 Mr. Brown asserts that his lawyers should have pursued his lead on a potential witness named James Sullivan. In his statements to the police and to his lawyers, Mr. Brown pointed to Mr. Sullivan as the true owner of the marijuana. Mr. Brown says that he identified Mr. Sullivan's car and told his lawyers that it had Kentucky license plates; he argues that his lawyers ought to have attempted to locate Mr. Sullivan. The district court rejected this argument for the reason that Mr. Sullivan could not reasonably be expected to volunteer incriminating information.
 
 
 18
 The Sixth Amendment does not require that counsel investigate and secure the testimony of every potential defense witness. See Lincecum v. Collins, 958 F.2d 1271, 1280-81 (5th Cir.), cert. denied, 113 S.Ct. 417 (1992); United States v. Snyder, 787 F.2d 1429, 1432-33 (10th Cir.), cert. denied, 479 U.S. 836 (1986); United States v. Curtis, 742 F.2d 1070, 1074-75 (7th Cir.1984), cert. denied, 475 U.S. 1064 (1986). Because a search for James Sullivan would have been costly, and because he did not seem to hold much promise as a witness, it was not unreasonable for the lawyers to have directed their attention and resources to other aspects of Mr. Brown's defense.
 
 
 19
 Mr. Brown also argues that his lawyers should have interviewed David and Juanita Dailey. David Dailey, he says, would have testified that he had traded guns with the defendant and had overheard an unidentified deputy sheriff telling Mr. Brown that it was acceptable for him (Mr. Brown) to own guns because he had been out of prison for fifteen to twenty years. He says that Juanita Dailey would have confirmed that the guns he kept in his home were for hunting and trading purposes only.
 
 
 20
 The defendant's attorneys testified that they did not interview the Daileys because they were never identified by Mr. Brown as potential witnesses. The district court found that the Daileys' names were not provided to the lawyers, and we cannot say that this finding was clearly erroneous. If the district court had found that the names were provided to the attorneys, moreover, we cannot say that it would have been incumbent on the court to hold that the Sixth Amendment obligated the attorneys to interview them. The potential utility of the Daileys' testimony seems marginal at best.
 
 
 21
 In a similar vein, Mr. Brown argues that his lawyers ought to have called Pat Maynard to testify about one of the guns (the loaded Mossberg) that was the subject of the indictment. Ms. Maynard was planning to move into the house with him, he says, and would have testified that the Mossberg was actually hers. Mr. Brown's lawyers felt her testimony might be more damaging than helpful, however, because she probably knew about the marijuana Mr. Brown kept in his home and about his extensive gun collection. We cannot fault the attorneys' judgment that this witness was likely to do more harm than good.
 
 
 22
 Mr. Brown also complains that Agent Charles Carter, who was present during the search of Mr. Brown's home, was never interviewed by the lawyers about the events that occurred on the day of the arrest. Agent Carter allegedly would have testified that Mr. Brown told him that the marijuana belonged to James Sullivan. Agent Carter's testimony would have been cumulative of other evidence presented at trial, however, and we have no reason to believe that it would have been particularly helpful to Mr. Brown.
 
 
 23
 As to whether the attorneys' failed to function as the counsel guaranteed by the Sixth Amendment when they decided to keep Mr. Brown off the stand, the attorneys testified at the hearing that in their judgment Mr. Brown would only prejudice his case by testifying. Apparently he wanted to explain to the jury that the guns he had in his home were used for sport rather than to protect his drug distribution scheme. The lawyers acknowledged that this testimony might help Mr. Brown in relation to count three, but it was clear to them that Mr. Brown, if he testified, would inevitably incriminate himself on counts one and two. Against this background, we agree with the district court that it was not impermissible for the attorneys to opt not to put Mr. Brown on the stand.
 
 
 24
 We think it clear, moreover, that Mr. Brown failed to establish that any deficiencies on his lawyers' part were so serious as to deprive him of a fair trial. The evidence against Mr. Brown was overwhelming, and it is unlikely that even Clarence Darrow could have got him off. Mr. Brown has not demonstrated "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 The agents ultimately found a total of three loaded guns and thirteen unloaded guns, many of which had no serial numbers